**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**NEW HAVEN DIVISION**

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| SERVICOM LLC, | : | Case No. 18-31722 (AMN) |
| JNET COMMUNICATIONS LLC, and | : | Case No. 18-31723 (AMN) |
| VITEL COMMUNICATIONS LLC, | : | Case No. 18-31724 (AMN) |
| | : | |
| Debtors. | : | (Joint Administration Requested) |

**MOTION FOR ORDER AUTHORIZING DEBTORS TO MAINTAIN
EXISITING BANK ACCOUNTS AND BUSINESS FORMS AND TO
<u>MAINTAIN EXISTING CASH MANAGEMENT SYSTEM</u>**

ServiCom LLC ("ServiCom"), JNET Communications LLC ("JNET") and Vitel Communications LLC ("Vitel") (the "Debtors"), by and through their proposed undersigned counsel, for their motion (the "Motion") pursuant to sections 105 and 345 of Title 11 of the United States Code (such title hereinafter the "Bankruptcy Code") for an order authorizing them to maintain their existing bank accounts and business forms, and to maintain their existing cash management system, respectfully state:

1.    On October 19, 2018 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  Pursuant to Bankruptcy Code sections 1107(a) and 1108, the Debtors continue to operate their businesses and manage their properties, affairs, and assets as debtors-in-possession. No trustee, examiner, or committee has been appointed in these cases.

2.    The Court has jurisdiction over this motion pursuant to 28 U.S.C. sections 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. section 157(b).  Venue is proper in this Court for these cases and this motion pursuant to 28 U.S.C. sections 1408 and 1409, respectively. The basis for the relief requested herein is Bankruptcy Code sections 105 and 345.

3. JNET is a Delaware limited liability company that provides overall management and administrative functions as the holding company for ServiCom and Vitel. JNET, in conjunction with its subsidiaries, constitute a full service, outsource provider of customer contact management and telecommunication infrastructure fulfillment services to Fortune 1000 companies. JNET was founded in July 2003 by David Jefferson, a former senior executive of Comcast Corporation and AT&T Corporation. JNET has grown significantly since its founding. JNET realized on a consolidated basis $80 million in revenues in 2017 and is on track to generate revenues of $70 million in 2018 largely from its two separate but complementary subsidiaries, ServiCom and Vitel. As of the Petition Date, JNET independently employs approximately 31 people.

4. ServiCom is a Delaware limited liability company that is wholly owned by JNET. ServiCom provides a comprehensive suite of call center outsourcing services to a broad range of industries. The customer care and telemarketing capabilities include inbound calls, outbound calls, internet sales, customer service, customer retention, customer affairs, market research, help desk, lead management, interactive services, and fulfillment services. ServiCom primarily serves clients in the insurance, utility and telecom industries. ServiCom maintains its principal assets and operates a call center location in Milford, CT. ServiCom also operates call center locations in Machesney Park, IL and Sydney, NS (Canada). As of the Petition Date, ServiCom employs approximately 800 people.

5. Vitel is a Delaware limited liability company that is also wholly owned by JNET. Vitel provides installation and construction related services and other customer management services to cable and telecom companies, including installation of cable and telephone equipment, high speed data and digital phone installation, multiple dwelling unit construction and customer

save services. Vitel currently operates in Georgia, Maryland, New Jersey, Ohio and Texas. As of the Petition Date, Vitel employs approximately 25 people.

6. Unfortunately, the Debtors suffered significant losses in 2017 and 2018 year-to-date attributable to multiple factors.

7. First, ServiCom expanded its operations in anticipation of significant additional business. Specifically, early in 2016, ServiCom was awarded a significant inbound calling program. This required the addition of a third call center in Illinois which opened in September 2016. The new program and facility required a tremendous investment in equipment, infrastructure, and personnel. This expansion also took much more time than anticipated—and with delay came further costs. This work had the potential to be ServiCom's single most profitable program. Unfortunately, the call volume anticipated from the customer did not materialize at the rate they projected, resulting in negative cash flows.

8. Another customer decided in 2017 to discontinue its one type of inbound customer service work and replace it with another. This is not an issue in and of itself. However, the pull back of the former work happened at a much faster pace than the substitution of the new work. The significant drop in revenue experienced during the phase out produced cash flows insufficient to cover the cost of the call center dedicated to this work. Then, in 2018, the customer cancelled the second program altogether leaving ServiCom with a large idle investment.

9. As for Vitel, the overall shrinking of the residential cable industry significantly decreased revenue. In particular, starting in late 2017, one cable company reduced the amount of fulfillment work assigned to subcontractors like Vitel by 40%. This had a significant adverse impact on cash flow. In response, Vitel took the necessary steps in 2018 to right size its operations

in light of these changes only to see a further dip in revenue awarded. The 2018 construction work from new contracts was also delayed from Q2 to Q3, compounding the overall losses suffered.

10. JNET and its subsidiaries have responded to this contraction by closing a number of facilities and otherwise reducing the size of its business and operations which has resulted in a significant reduction in its overhead and personnel costs. Their overall enterprise and infrastructure are now consistent with the volume of work they currently have and reasonably anticipate having for the foreseeable future. Unfortunately, there exists significant unpaid expansion costs, liabilities arising from the subsequent downsizing of its operations, and other resulting financial challenges. These circumstances have also placed a tremendous burden on JNET's and its subsidiaries' working capital. Thus, JNET, ServiCom and Vitel seek bankruptcy relief under Chapter 11 so they can focus on their going forward business and return to profitability, and address their liabilities.

11. The Office of the United States Trustee has established certain operating guidelines for debtors-in-possession in order to supervise the administration of Chapter 11 cases. Under these guidelines, a Chapter 11 debtor generally is required to open new "debtor in possession" bank accounts for cash and designate their checks as checks of a "debtor in possession." These requirements are designed to establish a clear line of demarcation between pre- and post-petition transactions and prevent unauthorized payment of pre-petition claims.

12. Prior to the Petition Date, the Debtors, in the ordinary course of business and in connection with their cash management system, maintained certain bank accounts. JNET, ServiCom and Vitel each maintain a separate bank accounts at Bank of America, with ServiCom having additional bank accounts at RBC Royal Bank for its Canada operations, and do not commingle their funds (collectively, the "Bank Accounts"). The accounts are used for, *inter alia*,

the receipt of deposits from the collection of accounts receivable, electronic fund transfer payments, payments made by mail, and deposits for payroll.

13. The Debtors seek a waiver of the United States Trustee's requirement that the Bank Accounts be closed. Enforcement of this requirement would cause disruption in the Debtors' businesses and the incurring of needless expense.

14. The Debtors request that the Bank Accounts remain open in order to meet interim operational requirements, subject to Court approval, and to continue to be used in the ordinary course of the Debtors' businesses. Specifically, the Debtors request that the Bank Accounts be deemed to be debtor-in-possession accounts, and that the Court authorize their maintenance and continued use, in the same manner and with the same account numbers, styles, and document forms as those employed during the pre-petition period.

15. Because of the nature of the Debtors' businesses, it is imperative that the Debtors be allowed to maintain their Bank Accounts in accordance with their usual and customary practices. In many Chapter 11 cases, courts have recognized that strict enforcement of the requirements that a debtor-in-possession close all of its bank accounts does not serve the rehabilitative purposes of Chapter 11 and have waived such requirements and replaced them with alternative procedures.

16. Similar authorization is warranted in this case. Only if the Debtors are authorized to continue using the Bank Accounts can the transition to Chapter 11 be smooth and orderly, with minimal interference to continuing operations. In order to conduct post-petition businesses, the Debtors need to be able to receive payments from customers and to issue checks to vendors, service providers, employees and others.  Opening additional new accounts and obtaining checks for those accounts will cause delay and disruption to the Debtors' businesses. By preserving business

continuity and avoiding the operational and administrative paralysis that closing all of the Bank Accounts and opening new ones would create, all parties in interest, including, among others, employees, vendors and customers, will be best served, and the benefits to the Debtors' estates will be considerable.

17. The Debtors also request the authority to open or close any of the Bank Accounts if, in the exercise of their business judgment, the determine that such action is in the best interests of their estates.

18. The Debtors will continue to maintain records respecting transfers relating to the Bank Accounts so that transactions may be ascertained after they have occurred and will maintain records that recognize the distinction between pre-petition and post-petition activities.

19. In addition, the nature and scope of the Debtors' businesses and the numerous suppliers of goods and services and others with whom the Debtors transact business require that the Debtors be permitted to use their existing business forms, including, but not limited to, checks, letterhead, order forms, customer sales orders, and customer credit contracts, without alteration or change. Replacement of the Debtors' existing business forms would be duplicative and place an undue burden on the Debtors' estates. The Debtors believe that equitable considerations, as well as the "doctrine of necessity", amply justify such continued use.

WHEREFORE, as set forth above, the Debtors request that this Court enter an order authorizing the Debtors to maintain the Bank Accounts and their existing business forms and to maintain their exiting cash management system, and granting the Debtors such other relief as the Court deems just and proper.

Respectfully submitted this 19th day of October, 2018, at Bridgeport, Connecticut.

        SERVICOM LLC,
        JNET COMMUNICATIONS LLC
        and VITEL COMMUNICATIONS LLC

        THE DEBTORS

By:   */s/ Stephen M. Kindseth*
      James Berman (Federal Bar No. ct06027)
      Stephen M. Kindseth (Federal Bar No. ct14640)
      Patrick R. Linsey (Federal Bar No. ct29437)
      ZEISLER & ZEISLER, P.C.
      10 Middle Street, 15th Floor
      Bridgeport, CT  06605
      Tel. 203-368-4234
      Fax 203-367-9678
      Email:  skindseth@zeislaw.com
             jberman@zeislaw.com
             plinsey@zeislaw.com
      Their Attorneys